United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VICTOR TREVINO,                    )    No. C 04-0720 MMC (PR)
                                   )
            Petitioner,            )    **ORDER DENYING PETITION FOR**
                                   )    **WRIT OF HABEAS CORPUS**
     v.                            )
                                   )
EDWARD ALAMEIDA,                   )
                                   )
            Respondent.            )
_____  )

On February 20, 2004, petitioner, a California prisoner proceeding pro se, filed the

above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On April 29,

2004, the Court ordered respondent to show cause why the petition should not be granted

based on the cognizable claims contained therein.  Respondent filed an answer, accompanied

by a memorandum and exhibits, and petitioner filed a traverse.

**BACKGROUND**

In 2000, in Santa Clara County Superior Court, petitioner was tried and convicted of

multiple felony offenses, including vehicle theft, escape from custody, assault, and being

under the influence of methamphetamine.  Petitioner thereafter filed an appeal.  The

California Court of Appeal summarized the facts adduced at trial as follows:

> On June 22, 1999,[1] Salvador Topete started his 1989 GMC van in the
> driveway of his Mount Prieta Drive home and then went inside.  By the time
> Topete came outside five minutes later, his van had been taken without
> permission.  Topete called the police.
>      That night, Rebecca Fletes was having a barbecue at her Cliffwood

_____

[1]All further calendar references are to 1999 unless otherwise specified.

Drive home when defendant pulled into her driveway in a van. Nobody was with him, and he told Fletes' friend, Tanya Harris, that the van belonged to him. When he tried to "pick up on" one of Fletes' friends Fletes told him to leave since he was disrespecting her. Defendant could not find his keys; he left after accusing the host and guests of stealing them and saying "I'll be back." Twenty minutes later, a brick was thrown through Fletes' front window, and someone called 911. While defendant was parked in Fletes' driveway, Officer Thuy Le pulled behind him.

People ran out and pointed at the van, and Le saw an arm in a black nylon jacket emerge from it.[2] The van's white reverse lights activated, and it backed towards Le. Le left his car, pointed his gun, and ordered defendant out of the van. Defendant walked towards Le but then ran off. Le did not catch him but subsequently learned the van had been stolen from Topete. Latent prints lifted from its driver side exterior doorframe matched defendant's fingerprints. A backpack in the van did not belong to Topete.

Harris, who knew defendant as "Victor," described him as a five-five, 25-year-old Hispanic with a medium build, short hair, a goatee, and many tattoos, including "San Jo" on his stomach, a naked lady on an arm, and a "Mexican bird" on his neck. Fletes, her children, and three of her friends were the only people present while defendant was at the barbecue; according to Harris and Fletes, no one did drugs in the house that night.

At 8:30 p.m. on June 23, defendant arrived by mountain bike at Phillip Quiroz's Bal Harbor Drive home. Quiroz, who was 29 years old, had not seen defendant since the mid 1980's. Saying police were looking for him, defendant asked for a ride and offered $20 for gas. He appeared to be under the influence of methamphetamine and said he wanted to score PCP. He offered to give Quiroz "dope" in exchange for the ride, but Quiroz never received it and did not do drugs that night.

Quiroz had a driver's license and insurance. He drove defendant to Sanders Street in his 1992 teal Saturn. They picked up Robert White and another man, both friends of defendant. Quiroz did not belong to a gang and never had seen White before, but he thought White probably was a Norteno gang member given the tattoo with four dots and a star on his face.

Back at Quiroz's home, the fourth man took the mountain bike. Quiroz then drove defendant and White to Cliffwood Drive where defendant argued with a woman about a window, a van, and keys. Defendant then told Quiroz he had thrown a brick through her window. They next drove to King Street where defendant had another conflict; he left there saying he would return and "shoot up the house." Tired of driving around, Quiroz asked to know where they were going. Defendant asked why Quiroz was acting like a "bitch," ripped a gold chain from his neck, and struck him. Quiroz saw defendant pull something silver from his waistband. He thought it was a gun but did not stay to find out; instead, he fled [from] his car with its keys in the ignition. Defendant jumped into the driver's seat; as he and White drove by Quiroz, defendant yelled, "Don't call the cops." Quiroz did not give defendant permission to take his car.

Quiroz walked home and called 911. At 10:45 p.m., Officer David Spoulos broadcast a description of the car and suspects. Spoulos said Quiroz did not appear to be under the influence of drugs while they were together.

At 12:07 a.m. on June 24, Brad Hendrickson heard a skid and crash outside his Mount Prieta Drive home. His car had been hit and had teal paint transfer marks on it. He gave officers a teal-colored fender piece he found under his car.

---

[2] Le knew dispatch had broadcast a description of the suspect as wearing such a jacket.

2

Police determined the hit-and-run accident was a result of unsafe speed.[3]

That same morning, police stopped Victor Nanez at the 7-Eleven near Mount Prieta and asked him about a carjacking. Nanez, who was high on heroin and methamphetamine, said his name was "Manuel." Nanez had gone by "Manuel," his middle name, since he was a child. When he showed police his identification, they arrested him. Nanez was released after police brought Quiroz to the 7-Eleven to view both Nanez and defendant.[4]

At 1:51 a.m. that morning, Officer Daysog saw a green Saturn speeding at 100 miles per hour. Having heard the carjacking broadcast, he pursued the car, he lost sight of it but found it parked at 3483 Mount Prieta. Officers set up a perimeter; sometime after 3:30 a.m., as they approached the house, the Saturn went down the street without lights, made a U-turn, and parked. Defendant exited the car and ran; he was caught when he fell. Defendant was taken to the nearby 7-Eleven, and police brought Quiroz there to view defendant and Nanez. Quiroz identified defendant as the person who had taken his car. It was stipulated defendant was 5'7" and weighed 160 pounds that day.

Quiroz never had been to 3483 Mount Prieta. He testified that his rear view mirror and a panel on his central console were gone and parts of the fender had broken off. It cost $5,000 to fix the damage caused by the crash. The fender piece found by Hendrickson fit the Saturn's fender.

When arrested, defendant had a crack pipe and the Saturn key in his pocket. A second pipe was found on the passenger seat and a knife was found on the driver's floorboard. Quiroz said the knife, the pipe, and a silver chain found in the Saturn were not his; he never saw his gold rope chain again.

The parties stipulated no firearm was found during the investigation and that a blood sample obtained from defendant at 7:15 a.m. on June 24 tested positive for methamphetamine.

On October 8, after Correctional Officer Gomez received information regarding a weapon on defendant's tier [at Santa Clara County Jail], he handcuffed defendant from behind, searched his cell, and then removed the cuffs. Defendant did not complain to Gomez that he had been hurt, and Gomez testified he did not accidentally cut defendant's wrist with the cuffs. That night, defendant wore waist chains as he spoke to Sergeant Ray about his cuts. Defendant had a straight cut on an inner arm, two or three inches above the wrist; that cut was three inches long and one-eighth inch deep. He had a short second cut. Each cut went from side to side. The larger cut was bleeding. At nursing staff s request, defendant was sent to Valley Medical Center (VMC).

Shortly before 10:00 p.m., Correctional Officers Alan Tse and Francis Salazar transported defendant to VMC in the back of a caged sedan. En route, Tse asked defendant for his date of birth and social security number; defendant-

---

[3]Defendant was found not guilty of carjacking Quiroz's car (Count 1) and of the robbery of Quiroz's gold chain (Count 2). He was convicted of the vehicle theft of Quiroz's car with a prior vehicle theft conviction (Count 3).

[4]Nanez did not have a tattoo of a parrot on his neck; he had tattoos of humming birds on both sides of his neck and "San Jo" on his back. Nanez testified that he did not attend a party on Cliffwood Drive the night before he was stopped and that he was not with defendant that night. He never had seen the GMC van before and did not steal it. Nanez did not recognize the backpack found in the van. Nanez had met defendant about a week before he was detained; they had partied together and used drugs.

provided the date but said he had forgotten his social security number.[5]  The officers had been told not to park at the emergency ambulance entrance, which was under construction.  Salazar stopped near that entrance; he stood outside the car and watched Tse escort defendant inside before parking.  Having visually checked defendant's waist chains when he left the car, the officers agreed the chains appeared to be "secured" at that time.

Tse took defendant through two sets of glass doors to the emergency lobby and down a corridor to the custody area where chairs were lined up against a back wall.  Defendant sat down at Tse's request.

Tse got an arrival form from a desk and then called the jail to get defendant's social security number.  As he said, "Hey, Stankiewicz, this is Tse," in his right peripheral vision, Tse saw defendant come towards him and then felt a sharp blow to his head.  He yelled, "hey" and dropped the telephone.  When defendant lunged toward Tse's side where his gun was located, his waist chains were no longer around his body; the chain and cuffs were now on his hands.  Defendant's hands were "on the pistol handle" so Tse tipped his holster up to guard the gun.  Defendant "tried to rock" the gun out of the holster; in response, Tse unsuccessfully tried to lock defendant's hands on the holster.  Defendant then tried to choke Tse with his waist chains, but Tse raised one hand to prevent the chains from going below his head.  When defendant "went for the gun again" and touched its handle, Tse again tilted the holster and tried to lock defendant's hand on it.  Defendant again tried to choke Tse, and one cuff hit Tse's sternum.  As Tse tried to block the chains, nurse Esparz[a] and emergency technicians Steven Frost and Joseph D'Acie[rn]o arrived in response to Tse's call for help.

Frost and D'Acierno saw defendant come through the double doors, and D'Acier[n]o testified defendant had waist chains on when he came inside.  The two ran when they heard a scuffle and saw defendant on top of Tse's back, trying to grab Tse's side where his holster was.  Tse was "crouched and bent," "trying to fend [defendant] off."[6]  Defendant's waist chains were over Tse's head or around his neck, and Tse was trying to hold them.  While Frost pulled defendant's arm from Tse's head, D'Acierno hit defendant.  When Esparza heard a scream, he ran towards the struggle and saw D'Acierno and Frost holding onto defendant.  Esparza came up behind and brought defendant to the ground.  Defendant's hands were above his head. His waist chains were attached to his hands, but they were free.  Esparza also noticed that the telephone in the custody area had been ripped from the wall and was lying on the floor.

Patient Benito Garcia saw the officer and inmate walk through the emergency doors and head to the custody area.  At that time, the inmate had handcuffs and waist chains on.  Garcia saw the officer sit the inmate in a chair and then go to the left where there was a counter.  Garcia next saw the inmate's chains "swinging from the middle of the handcuffs" as he was "charging the officer."  Garcia saw defendant bring the chains over the officer's head and heard the officer call for help.  Garcia then saw hospital staff rushing to the area.

When Salazar entered the hospital, he saw Tse and VMC staff holding defendant face down on the ground.  Defendant was handcuffed but the chains were off the front of his waist.  Once on a gurney, defendant received a shot and was secured with leather restraints.  Another officer then resecured the waist

---

[5]Salazar testified Tse picked up papers at the control center and that those papers should have contained defendant's personal information, including his social security number.  Salazar did not recall Tse asking defendant for his social security number en route to VMC or defendant responding that he did not know it.

[6]Alteration in original.

chains.

Tse's gun was not examined for fingerprints. Tse had injuries on his forehead, sternum, shoulder, hand, wrist, and the sides of his face near his ears. Two fingers were swollen. D'Acierno testified the laceration to Tse's head which bled had to have been caused by something sharp or a heavy metal object rather than by a slap or a hit with a fist.

On the evening of October 8, Officers Stankiewicz and Alvarez were in the jail control center. At trial, Stankiewicz did not recall getting a call from Tse, but Alvarez testified he recalled Stankiewicz telling him that he had been on the phone with Tse when [he] heard a scream and the line went dead. The log showed that Tse and Salazar "requested assistance at VMC ER. County Com Advised, Sergeants Ray and Laverone advised." Ray and Laverone received a call around 10:00 p.m. in which they were advised the control station had been talking to Tse when "a commotion" was heard and "the line went dead." When Ray and Stankiewicz informally spoke days later, Stankiewicz said "it sounded like something was going on" during the initial call and that, when they received calls from a VMC nurse, it sounded like a "big fight going on."

Salazar wrote an employee report of the incident for internal jail informational purposes but did not turn it in because Tse had submitted a report and had all of the information. A week after the incident, Ray asked Salazar to write a supplemental crime report. Salazar transferred the information from his employee report to the crime report and destroyed his first report. Salazar never was instructed to turn in his employee report, which basically was "notes." A supervisor did not tell Salazar that he did not like the employee report or order him to rewrite it.

Therapist Sharon Downing met with defendant at the jail on October 9. Defendant said he wanted to tell her "how sorry I am for what I did at VMC" and asked her to tell the officer he was sorry, but she said she could not "help [him][7] with that." On October 16, Tse was conducting cell checks when defendant told him he was sorry for what happened the other night. Tse told defendant he just was glad to be alive and go home and see his girl.

On October 30, defendant asked Correctional Officer Richard Gomez if he could use the telephone. When Gomez obliged, defendant said, "Hey, Gomez you got an extra lunch? I didn't even try to kill the officer." He added, "I was just trying to take his gun." He said he was "trying to escape," that he had "the opportunity so he went for it" because he was "looking at 85 years to life." Defendant said he had told the officer "not to take it personal [sic],"[8] and the officer said he was "happy to go home to see his daughter." Defendant said he was telling Gomez this "off the record." Gomez said "okay," walked away, and notified his supervisor. Gomez did not converse with defendant when transporting him to court in this case. He never was alone with defendant while [he] escorted him. Between October 30 and March 2, Gomez saw defendant a couple of times but did not talk to him because he was a witness in this case and did not want to jeopardize the prosecution.

Diana Segovia, who had a child with defendant, twice ignored subpoenas to appear in this case because she did not want to be a part of "trying to send [defendant away][9] for life." She was picked up on a bench warrant.

Segovia testified she and defendant had an off-and-on relationship in

---

[7]Alteration in original.

[8]Alteration in original.

[9]Alteration in original.

December 1997. On December 31, 1997, the two argued when Segovia refused to buy him clothes. Her family did not want defendant at their gathering that night, so she bought him some champagne and dropped him at his cousin's house.

When Segovia returned home early the next morning, she found her bathroom window broken and defendant asleep on her couch. Once awake, defendant said he had found a way to get inside; he angrily said to leave him alone and let him sleep. Segovia believed he was under the influence of drugs or alcohol. She confronted defendant about breaking in and told him he had to leave. Telling her to shut up, he said he was "going to get the hell out of [her][10] life" and demanded his clothes. Scared to death, she tried to find them. When he said he had become "a monster. Now you're going to see . . . how terrible I can become," Segovia saw rage in his eyes.

While defendant dressed, Segovia opened the door in case she needed to run. He asked how much money she had. When she said she had none on her, defendant kicked her dog. She grabbed at the dog, begging him not to hurt her. Defendant then tried to grab the dog's neck, saying he could kill it right now. Defendant threatened Segovia's life, saying she should go to South America because "this shit is not over yet." She grabbed the dog and ran outside. Defendant followed and told her to come back, that she knew what he could do. When she jumped a fence, he did the same and grabbed her. He pressed against her body and said she had better shut up, that he could hurt her. Segovia believed defendant did not want to make a scene outside because he was on parole and she had called the police on him before. He grabbed her, pushed her onto the porch, jumped on it, shoved her inside, and chained the door. She feared he was going to kill her. When asked again how much money she had, Segovia said she might have about $300. He then demanded she drive him to an ATM machine.

Thinking defendant would kill her if she got in the car, Segovia got her ATM card and went outside. She saw neighbors outside and considered contacting them but defendant warned her not to do so, that she knew what he would do to her. When she got in her Toyota, she did not use her seat belt because she thought she might have to jump out. When she accidentally ran a red light, defendant thought she had tried to get an officer's attention. He told her this is not over, she had better go to South America. He said if she contacted anyone he would bomb her house. She drove to an ATM machine in Burlingame. A police car was there, but defendant told her he would kill her if she went to the police. Segovia withdrew $300 from her account and then saw someone coming from a taxi. She looked over and said "help," but the person did not assist her.

Segovia refused to get back in the car, saying defendant had the money and the train station was nearby. He ordered her to get in, saying he was going to drive. When she began to walk away, he tried to pull her back. He told her to give him the keys and get in, that he would drive. Scared, Segovia ran off. He ran after her, grabbed her, brought her back, and told her not to run for help, that she knew what he would do to her. Tossing him the keys, she said, "Here, have the keys, take my car, I don't care." He said [he] would kill her said if she told the cops. She testified she did not give defendant permission to take her car, that she gave him the car "out of fear" for her life. As she ran away, defendant said he would come back and kill her if she told the cops anything.

Segovia asked gas station employees to call 911, but they did not do so. She saw defendant drive by and thought he was going to her house because he had her keys. She called 911 and told an operator defendant had gone crazy on her and had taken her car and keys. Told to stay on the line and that an officer would meet her, she said, "I'm so scared! They didn't want to help me at the gas

---

[10]Alteration in original.

station."

Segovia recovered her car two or three days later at a towing yard in San Jose. She still loved defendant and communicated with him.

On January 4, 1998, Sergeant Robert Millard stopped Segovia's Toyota while Alfred Cardona was driving it. At trial, Cardona denied knowing defendant; he said he did not recall what he had told the police because he had had a serious drug problem at that time. Millard testified Cardona said, "F-ing Victor. He told me this was his lady's car." Cardona also said he got the car from defendant and that Millard could find defendant at 3483 Mount Prieta.

The following testimony was introduced on defendant's behalf.

Tanya Harris and Rebecca Fletes testified they never had told the police that defendant claimed the van was his.

Robert White testified he, Quiroz, and defendant smoked methamphetamine in Quiroz's garage on June 23. Quiroz drove his Saturn while the three smoked crank in a glass pipe. They ran out and were going to get more when defendant and Quiroz argued because Quiroz could not accompany them. Quiroz angrily pulled off his gold chain, and he and defendant slapped each other until Quiroz jumped from the car and took off on foot. Defendant asked where he was going, but Quiroz kept walking. After waiting for Quiroz for five minutes, White moved to the front, defendant got in the driver's seat, and the two drove to a house on Mount Prieta to get drugs. White said defendant did not pull a gun and aim it at Quiroz and that nothing happened that led White to believe defendant was taking the car away from Quiroz.

Defendant had lived with Shirley Tollner since he was 16. On the evening of October 8, he called her from jail and said he was going to kill himself. He said not to call anyone because it would be done before they came, but Tollner called 911. Sergeant Ray called her an hour later and said he was taking care of the situation. Ray called back after midnight and said defendant was okay. When Tollner saw defendant four days later, his wrist had a "scratch" that was healing with a scab across it. Defendant told her he could not go through with it, that he could not kill himself. He said he got the cut from cuffs when he was restrained.

Captain Virgil King testified it was jail policy that all inmates transported outside the facility "be secured," that transporting officers maintain "constant vigilance and ensure the proper use of restraint equipment" and that, upon arrival at their destination, officers were to "make a physical check of all restraints."[11]

Officer Carl Evans testified that, when he transported inmates to VMC, he got their personal information from custody sheets available at the control center. He added that if information was missing, officers could call central control to get it.

Officer Stankiewicz testified he did not recall talking to Ray about a call he received from Tse when the line went dead while they were talking. Stankiewicz remembered a call from a nurse, but not from Tse. Stankiewicz was not saying Tse's call was not received; he just did not specifically remember it.

Sergeant Larry Goodman testified the prosecution asked him to locate VMC records for the extension Tse had used. Goodman could not find any record confirming a call made on October 8 at 10:00 p.m. from that extension. There were no records of calls placed on that extension for about a week after the incident, but Goodman could not find a repair bill indicating why the telephone was shut down.

Correctional Officer Carl Evans testified he was at VMC on October 8

---

[11]At the time of trial, no decision had been made in the internal affairs investigation as to whether Tse and Salazar had been negligent. In Tse's seven years as a correctional officer, there never had been a complaint that he had assaulted an inmate.

when he was paged.  At the custody area, he saw several people doing something with the waist chains of defendant, who was on the floor.  Those chains were not around defendant's waist, but the cuffs were on his hands.

After examining photographs and records concerning injuries suffered by defendant and Tse, Dr. Michael Laufer testified the cut above defendant's wrist looked like cuts he had seen when a handcuff was put on tightly and the person was turning his hand.  A nurse wrote "assessment laceration right wrist self-inflicted" and "not suicide attempt" in her notes, and defendant's psychiatric assessment found that he was not suicidal.  The medical records described a superficial wrist laceration.  In Laufer's opinion, it was not a true suicide attempt because, generally, people who want to kill themselves slice from the wrist to elbow.  The cut was on defendant's dominant hand, which also was unusual; in most suicide attempts, people use their dominant hand to cut the opposite wrist and generally slice deeply.  Laufer believed the V-shaped mark on Tse's head was caused by a handcuff hinge and that the forehead abrasion was made by a chain dragging across it.  The shoulder injury appeared to have been made with more significant force downward because the chain was wrapped around Tse's shoulder.  Laufer did not see any constriction marks on Tse's neck.  He felt Tse's injuries were relatively minor and did not require a lot of force to inflict.

Laufer had witnessed inmates slip their waist chains when he worked at VMC.  He noted that, if those chains were improperly applied, it was relatively easy to slip them. Laufer had asked deputies to tighten the chains before evaluating a patient when the chains were slung low on the hips.

Defendant testified on his own behalf as follows.  He was born addicted to narcotics because of his mother's addiction.  He was in Delancey Street's drug rehabilitation program in June 1999, and he understood he would do ten years in prison for the Segovia case if he did not complete the program.  Nonetheless, he walked out of Delancey about a month before the Quiroz incident.  Segovia picked him up and dropped him in East San Jose in a drug area where defendant encountered Aaron White and asked if he knew where to get methamphetamine.  They walked around and got drugs; after that, the two saw each other off and on.

On June 21, defendant met Victor Nanez at Shawn Manson's house.  He knew Nanez as "Manuel."  Nanez was a Norteno; defendant had been one but had left the gang in 1995.  The two left Manson's house and went to Linda Gomez's house on Mount Prieta to party.  Defendant met Cardona there. Cardona took Segovia's car.  Defendant bought some methamphetamine, they passed around a pipe, and defendant fell asleep on a couch. At about 1:00 p.m. the next day, he walked to Nanez's house, and the two decided to get drugs.  Nanez, who was a heroin addict, did not have a car but said he had borrowed his cousin's van.  Nanez drove the van but was swerving, so defendant told him to pull over, that he would drive.  Nanez lay in the back and nodded off.  Defendant saw Tanya Harris on the corner at Cliffwood.  Having purchased PCP from her in the past, he asked if he could buy $60 worth of methamphetamine.  Harris said, "yeah, pull over [in][12] the driveway."  Defendant parked there and followed Harris inside; he left Nanez in the van and took its keys with him.  People were playing cards inside. When Harris gave him a sixteenth, defendant packed a bowl and passed it around.  Nanez knocked on the door, and Harris let him in.  He said he was going to leave for awhile, he was feeling sick, and he would return for defendant.  Nanez never told defendant the van was stolen.

Defendant tried to flirt with a girl.  Fletes wanted him to keep packing the bowl, but he wanted to share the rest with Nanez.  Fletes angrily told defendant to stop flirting and leave.  He said "f-you" and left.  He soon returned to ask where

---

[12]Alteration in original.

8

his friend's keys were.  Told they did not have them, defendant assumed they did and got upset; he said he would be back and walked to the driveway.  When he knocked and asked for the keys again, he received the same answer.  He then threw a brick through the window, jumped in the van, put it neutral, and began backing up to move out of the driveway.  As he did so, Officer Le showed up and said "freeze."  Everyone cane out and pointed at defendant.  Defendant, who was on parole and had drugs in his pocket, pointed too, as if he were pointing at somebody down the street.  When Le looked, defendant ran off.  He eluded Le by jumping some fences and entering a home where he earlier had tried to buy drugs.  Those people allowed defendant to sleep in a shack behind the house.  The next morning, he walked to White's house.

White and defendant walked to Raul Moreno's house on Sanders to get some PCP, but Moreno had none.  Defendant borrowed Moreno's mountain bike, went down the street, and bought a gram.  He hid the drugs in his genital area and was returning when he saw Officer Le by Fletes' home.  He looked at Le and crashed into a truck.  When Harris and Fletes came out, defendant thought Le would chase him so he rode down Bal Harbor until he saw a guy named Angel in a garage.  He told Angel he thought the cops were after him and asked for a ride.  Angel said he did not have a car.  A kid ran inside and called his dad, and Quiroz came out.  Defendant had not seen Quiroz in years.  Quiroz agreed to drop defendant off in exchange $20 worth of methamphetamine.

Defendant did not have a driver's license.  Quiroz drove.  After picking up Moreno and White in the Saturn, the four returned to Quiroz's home, and Moreno left on his bike.  Quiroz got in his car, pulled out a knife, and crushed a rock of crank, which they consumed.  They then drove to Mount Prieta to buy more dope.  When defendant and White left the car, someone became angry that they parked in front of the house and brought along a stranger.  They left and went to Nanez's house to get dope, but nobody was home.

Next, they drove towards the home of a girl who owed defendant some crank.  As they passed the Cliffwood house, defendant told Quiroz what had happened the night before.  Quiroz stopped the car and encouraged defendant to do something.  Defendant exchanged words with Harris.  When they arrived where they were going to get the methamphetamine, defendant had a verbal confrontation with the girl who owed him the crank when she said he had to come back.

Defendant wanted to go back to Mount Prieta but could not take Quiroz with him.  Quiroz was angry and did not want to drive there; he parked by a school, pulled out a glass pipe, and scraped out residue to get some hits.  Upset because there were officers in the area and children playing at the school, defendant snatched the pipe.  Quiroz smacked him, and defendant hit back.  Quiroz tried to take off his shirt.  Defendant did not see Quiroz pull off his chain and did not know Quiroz had one.  They yelled at each other until Quiroz left the car and began walking away.  Defendant asked where he was going, but Quiroz kept going, having left the keys in the ignition.  For about five minutes, defendant sat in the passenger seat, debating whether to walk or to try to calm Quiroz down and give him the keys.  Although he knew he should walk to Quiroz's house and give him the keys or to just leave the car there, he did the "stupid" thing, driving off with White in the car.

Defendant returned to Mount Prieta where he and White bought some dope and started smoking.  When White wanted to go home, defendant drove him and then returned to Mount Prieta.  He came around a corner faster than he should have; to avoid a dog in the street, he swerved and hit a truck but just kept going to Mount Prieta to buy drugs and take them to Quiroz as promised.  Once there, he parked in the driveway and went in.  He had to move out of the driveway while his drugs were being made up and planned to park on the corner.  As he was

moving the car, lights came on and he was told to "freeze." He panicked and ran because he had PCP on him. Police tackled him when he tripped. Defendant testified Quiroz did not give him permission to use his car but had left it there like he did not really care. Defendant did not believe Quiroz would get mad since they had known each other since they were kids. Defendant said he did not want Quiroz's car and was going to give it back to him.

When Officer Imobergsted interviewed Nanez the morning of June 24, Nanez said he was walking to 3483 Mount Prieta to meet his friend "Victor." When he saw patrol cars heading to that area, he became scared and walked to the 7-Eleven. Nanez, who was age 38, was five-nine and weighed about 205 pounds.

During booking, defendant insisted his name was Kenny Lopez because he was on parole and had 10 years hanging over him. Asked if he knew why he was there, defendant said he did not. He said he was with his friend Quiroz that night. Le said defendant could probably walk that night if he was honest about what Quiroz did earlier in his car. Le was not specific what it was; he just said "something, a crime, you know."

Shirley Tollner was like a mother to defendant. He called her on October 8 because Gomez had abused him after saying he had to search defendant's cell because a weapon had been reported on the tier. When defendant complained that he was nude and had soap on him; Gomez said "Cuff the F up." When defendant said the cuffs were tight, Gomez said to shut up. While putting defendant back in the cell, Gomez yanked the right cuff off and sliced defendant's wrist. Defendant "cussed" Gomez out, asked to see a sergeant, and complained, "Look what you did to my wrist." When defendant spoke to Tollner about four hours after Gomez had cuffed him, he said he felt like killing himself and not to send anybody because it would be done, but then he did not have the courage to kill himself. When officers came and asked if he was suicidal, defendant denied he was, but they handcuffed him and took him to Sergeant Ray who said he had spoken with Tollner. After defendant said Gomez had cuffed him too tight and hurt him yanking the cuffs off, Ray left to talk to Gomez. When a psychiatric technician arrived to find out if defendant was suicidal, he denied it. Nurses examined the cuts and said they had to send him to VMC, although defendant did not want to go. Ray put the waist chains and shackles on defendant in the interview room and made certain they were secure.

As Salazar and Tse took defendant to VMC, Tse asked for defendant's date of birth but not for his social security number, which defendant knew. Defendant thought Tse was trying [to] clarify his birthdate because the date on the booking sheet was not defendant's since he had several dates of birth from the a.k.a. he used. Salazar stopped by an exit door to the right of the emergency double-doors. A security guard provided keys to that door and Salazar gave them to Tse. While Tse watched, Salazar grabbed the side of defendant's waist chains and tugged them to make sure they were secure. Defendant did not go through the double doors since the area was fenced off. Tse opened the door and returned the keys to Salazar, who said he was going to get something to eat. Tse and defendant walked down the hall to the custody area where four chairs were connected to each other. Defendant did not see Tse on the telephone. Tse told defendant to have a seat, refusing defendant's request to sit on a gurney.

Defendant tried to sit but told Tse it hurt his wrists because he was handcuffed and the chairs had arms. He stood and again asked if he could sit on the gurney. Tse said "sit the f-down" and pushed defendant onto the chair. Defendant jumped up, and Tse tackled him. Defendant fell, and Tse was on top of him. Defendant put his hand on Tse's wrist to stop him from drawing his gun. Defendant screamed for help. He did not attack Tse. He did not slip his waist chains or try to choke Tse. The fight ended when defendant was "dog piled." He still had his waist chains on, and he had no idea how Tse was injured. He did not

strike Tse on the head with his waist chains.  After the incident, defendant saw Salazar eating something.

Salazar, Tse and a bald officer returned defendant to jail.  En route, they pulled over and the bald officer and Tse got out. The bald officer put a gun to defendant's head and said, "What's up now, Mother Fucker?"  They all then drove to the jail.

Between October 8 and October 30, defendant was subjected to abuse; he filed many complaints but no action was taken.  Officers woke him at night and beat him, claiming they were acting on Tse's behalf.  In another incident, Officer Hoggie entered defendant's cell and asked if he had a problem with Tse.  When defendant said no, Hoggie said he would be back.  He returned later, put tight waist chains on defendant, chained him to a bull ring, and left him.

Defendant denied apologizing to Tse.  He said Tse told him he did not want to lose his job because he had a little girl to care for and that defendant better not say anything.  The reason defendant apologized to therapist Downing was because he had been kept naked in a cell for three days and wanted out.  When Downing interviewed him, he was naked; he apologized to get these people off of him.  Defendant denied making any statement to Gomez.  He said their only contact after October 8 was a day when Gomez escorted defendant to court and asked about this case and defendant said to read the police report.  Defendant had no problem with Gomez before October 8, but Gomez had a reputation as a "snake" so defendant did not mess with him.

Defendant denied trying to escape or slipping his waist chains.  He admitted he had prior felony convictions for felon in possession of a firearm, grand theft, taking a car without permission, residential burglary, and robbery.

Sergeant Rogers interviewed defendant in connection with the Internal Affairs investigation in December 1999 and January 2000.  Defendant told Rogers he originally was sent to VMC because the officer accidentally sliced his wrist with the handcuffs on both sides and "then they tried to say I was trying to commit suicide."  Defendant said he never told Rogers that Tse went for his gun and he tried to prevent it.  When defendant asked if his statements could be used in a criminal investigation, Rogers said he did not know the answer to that.  Defendant was tricked because Rogers led him to believe he was helping the authorities with the misconduct investigation.  At the second interview, defendant recanted his earlier statement to Rogers that an officer put a gun to his head and said "What's up now M-f" because he had received threats about being found hung in his cell and was told to keep his mouth shut.  Defendant's current testimony was that Officer Zompolis pulled up his pants leg, showed him a gun at the hospital, and said, "I'm going to blow your fucking brains."

In rebuttal, Officer Le testified that when defendant insisted he was Kenny Lopez during booking, Le finally asked, "why do you think you are here."  Defendant said he thought it was bullshit, that Le had the wrong guy.  When Le said Quiroz alleged defendant stole his car, defendant said Quiroz had asked him to drive him because Quiroz did not have a driver's license, and he denied stealing any vehicles.  Le did not tell defendant he could walk if he told him what Quiroz did earlier.  Le had no authority to release somebody if there was probable cause that he committed a felony.  Le said he was driving a marked patrol vehicle the night of June 23 and that he did not see defendant riding a bicycle that night.

On January 15, 1998, defendant was in a jail interview room, yelling and banging its glass with his chains.  His waist chains were not around his waist but were hanging from his wrist.  He was agitated because he did not want to wear a shirt of the type worn by inmates in protective custody; he did not want to be placed in such custody because, although he was gang affiliated, he did not have enemies.  Officer Artz filled out a form on the incident, and a hearing was held the next day.  The form indicated there had been two rule violations, failure to

1    meet dress code and offensive conduct.  Its comment section indicated defendant
     had slipped his waist chains.[13]  Defendant admitted the two alleged violations.
2         Defense investigator Porras interviewed Nanez on May 23, 2000, the day
     Porras served him with a subpoena.  Nanez testified in the People's case the next
3    day.  The parties stipulated Imobergsted's police report regarding Nanez was
     given to the defense on May 22, 2000, the day the prosecution found it in the file.
4    Porras never interviewed Fletes or Harris about the incident.

5    People v. Trevino, No. H022406, slip op. at  (Cal. Ct. App. Oct. 16, 2002) (attached as

6    Resp.'s Ex. F) (hereinafter "Slip Op.") (footnotes in original).

7         The jury found petitioner guilty of two counts of vehicle theft[14] with a prior conviction

8    for vehicle theft, escape by force and violence from custody after being charged with a crime,

9    assault with a deadly weapon or by means of force likely to produce great bodily injury on a

10   custodial officer, and being under the influence of methamphetamine.  In addition, the jury

11   found certain sentence enhancements to be true, specifically personal use of a deadly

12   weapon.   In a bifurcated proceeding, the trial court found petitioner had sustained three prior

13   "strike" convictions and two prior prison terms.  The trial court sentenced petitioner to a term

14   of 67 years in state prison.  On appeal, the California Court of Appeal affirmed the

15   convictions and judgment.  The California Supreme Court summarily denied the petition for

16   review.

**DISCUSSION**

17

18   A.    Standard of Review

19         Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district

20   court may not grant a petition challenging a state conviction or sentence on the basis of a

21   claim that was reviewed on the merits in state court unless the state court's adjudication of

22   the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

23   application of, clearly established Federal law, as determined by the Supreme Court of the

24   United States; or (2) resulted in a decision that was based on an unreasonable determination

25   of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

26

27        [13]In 1998 there was no rule to write an infraction for slipping waist chains.

28        [14]The two counts were based, respectively, on the theft of Topete's van and the theft
     of Quiroz's Saturn.

1 § 2254(d).

2      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

3 court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

4 law or if the state court decides a case differently than [the] Court has on a set of materially

5 indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

6      "Under the 'unreasonable application' clause, a federal habeas court may grant the

7 writ if the state court identifies the correct governing legal principle from [the] Court's

8 decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at

9 413.  "[A] federal habeas court may nor issue the writ simply because that court concludes in

10 its independent judgment that the relevant state-court decision applied clearly established

11 federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

12 Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

13 whether the state court's application of clearly established federal law was "objectively

14 unreasonable."  Id. at 409.

15      Section 2254(d)(1) restricts the source of clearly established law to [the Supreme]

16 Court's jurisprudence."  Id.  "Clearly established federal law, as determined by the Supreme

17 Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

18 Court's decisions as of the time of the relevant state-court decision."  Id. at 412.  A state

19 court decision no longer may be overturned on habeas review simply because of a conflict

20 with circuit-based law, although circuit decisions remain relevant as persuasive authority to

21 determine whether a particular state court holding is an "unreasonable application" of

22 Supreme Court precedent or to assess what law is "clearly established."  Clark v. Murphy,

23 331 F.3d 1062, 1070-71 (9th Cir. 2003).  "A federal court may not overrule a state court for

24 simply holding a view different from its own, when the precedent from [the Supreme Court]

25 is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

26

27

28

B.      Analysis

     1.      Right to Counsel

Petitioner claims the trial court erred in admitting for impeachment purposes statements taken in violation of his Sixth Amendment right to counsel.  The California Court of Appeal set out the pertinent background to this claim as follows:

> Sergeant Rogers first interviewed defendant on December 26, 1999.  At that interview, he told defendant he was conducting an internal affairs investigation concerning the VMC incident and that he considered defendant a "witness" regarding "possible misconduct" by correctional officers Tse and Salazar.  When defendant asked "if his attorney could be present," Rogers, who was aware defendant had been assigned an attorney for the criminal charges stemming from the hospital incident, responded that he "would not proceed if [defendant] desired to have his attorney," that his attorney "could be present," and that, if he desired to have his attorney present, Rogers "would not proceed until [defendant] had his attorney present."  Defendant then "indicated to" Rogers that he "decided to continue the interview without the presence of his attorney" by saying "[s]omething to the effect of go ahead, let's talk."  Roger[s] said that, after he told defendant his attorney could be present if defendant so desired, defendant "decided to proceed without that option" without any promises or threats having been made.  Rogers acknowledged defendant had asked whether his statements could be used against him at his criminal proceedings.  Rogers did not directly answer the question; in response, he told defendant that his attorney would be informed about what they had talked about and that she might receive a tape of the interview.  Rogers told defendant that he was not sure what was confidential and what was not in a personnel action but that his attorney could contact internal affairs to obtain whatever she was entitled to get.  He made no promises regarding whether the conversation was confidential.  Before the second interview on January 20, 2000, Rogers reminded defendant of his right to have counsel present.  Defendant did not answer either way; he "just started talking" to Rogers.

(Slip Op. at 21-22.) (first three alterations in original).

After a hearing on the admissibility of the statements made by petitioner during the two interviews with Rogers, the trial court ruled that although the interview was conducted in violation of petitioner's Sixth Amendment right to counsel, the statements could be used for impeachment because they were voluntary.  (RT at 2010-12.)  The California Court of Appeal upheld the trial court's ruling, noting "voluntary statements taken in violation of the Sixth Amendment right to counsel may be admitted for impeachment."  (Slip Op. at 23 (quoting People v. Brown, 42 Cal.App.4th 461, 472 (1996).)

Respondent does not dispute that petitioner's statements were obtained in violation of his Sixth Amendment right to counsel.  See Massiah v. United States, 377 U.S. 201, 206-07

14

(1964) (holding that once right to counsel attaches, incriminating statements deliberately obtained from defendant outside counsel's presence are inadmissible at trial). Nevertheless, approving the use of such statements solely for impeachment purposes was not contrary to or an unreasonable application of "clearly established" Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1). As petitioner acknowledges, the Supreme Court has expressly left open the question of whether "a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel" may be used for impeachment. See Michigan v. Harvey, 494 U.S. 344, 353 (1989). Where, as here, there is no controlling Supreme Court precedent as to the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law under § 2254(d)(1). Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

Moreover, the federal circuits that have addressed the issue are split, with the Ninth Circuit and other circuits allowing voluntary statements obtained in violation of Massiah to be used for impeachment. See United States v. Ortega, 203 F.3d 675, 681 (9th Cir. 2000); United States v. Bender, 221 F.3d 265, 271 (1st Cir. 2000); United States v. Laury, 49 F.3d 145, 150 (5th Cir. 1995); United States v. McManaman, 606 F.2d 919, 925 (10th Cir. 1979); but see United States v. Spencer, 955 F.2d 814, 819 (2d Cir. 1991). The use for impeachment purposes of voluntary statements obtained in the violation of the Sixth Amendment does not violate "clearly established" Supreme Court precedent where, as here, the Supreme Court has not addressed the issue, and the federal circuit courts have split on the issue. See Carey v. Musladin, 127 S. Ct. 649, 654 (2006) (holding state court ruling not contrary to or unreasonable application of clearly established federal law given absence of decision by Supreme Court and divergence of opinion among lower courts).

Petitioner argues that even if voluntary statements taken in violation of the Sixth Amendment are admissible to impeach, his statements in this case were inadmissible because they were involuntary. A statement is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). The California Court of Appeal found the statements at issue herein were

1    voluntary, based on the following analysis:

2              Defendant contends his statements to Rogers were not voluntary
         because "Rogers misinformed [him] regarding his Fifth Amendment right
3        against self-incrimination when he told him that his statements could not be
         used against him at his criminal proceeding" and that, at both interviews, he
4        was "operating on the false assumption, conveyed to him by Rogers at the
         [first] interview, that his statements could not be used at trial."
5              The record does not support this claim.  When Rogers was asked
         whether he told defendant his statement would not be used against him in the
6        criminal case, Rogers did not answer the question but asked to look at a
         transcript of the conversation to refresh his memory.  After reviewing the
7        transcript of the initial interview, Rogers recalled that he asked defendant if he
         had any questions before they concluded the interview.  Defendant asked if his
8        attorney would know about their conversation and perhaps even get a copy of
         the tape recording.  Rogers explained that he was writing a confidential report
9        concerning a personnel action for the Internal Affairs Unit, and that he was not
         sure if defendant's attorney was entitled to the information.
10             Sergeant Rogers did not misinform defendant by telling defendant that
         his statements could not be used against him at his criminal proceeding, and we
11       perceive no coercion or implied threats or suggestions of leniency anywhere in
         the record.  The prosecution met its burden of establishing that defendant's
12       statements were voluntary.
               In summary, we conclude defendant's statements to Rogers were
13       voluntary and that those voluntary statements, although arguably taken in
         violation of the Sixth Amendment right to counsel, were admissible for
14       impeachment.  Accordingly, we conclude the trial court's decision to admit the
         challenged statements for impeachment was proper.
15

16   (Slip Op. at 26-27) (alterations in original).  Petitioner cites no authority for the proposition

17   that the foregoing analysis was "unreasonable" within the meaning of § 2254(d)(1).  As

18   explained by the Court of Appeal, Rogers did not threaten petitioner, did not promise him

19   leniency in exchange for his answers, and did not misinform him as to whether the

20   conversation would be used at trial.  Petitioner contends Rogers was "misleading" and

21   "obfuscating" when he told petitioner he was not sure it was "an absolute confidential

22   conversation."  (Traverse at 6.)  Rogers, however, never actually told petitioner that

23   petitioner's statements would not be used at trial, and any arguable implication to that effect

24   was far too remote for Rogers's statements to be deemed intimidating, coercive or deceptive.

25   Under such circumstances, and in the absence of any authority to the contrary, the Court of

26   Appeal's finding that petitioner's statements were voluntary does not constitute an

27   unreasonable application of federal law under § 2254(d)(1).

28

                                                16

The Court of Appeal further found that even if the trial court had erred in admitting petitioner's statements for impeachment, any such error was harmless.  Where, as here, the state court finds a constitutional error to be harmless, federal courts must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), determine whether the state court's harmless error analysis was objectively unreasonable.  See Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).  On this issue, the Court of Appeal's analysis was as follows:

> In any event, assuming the trial court erred by admitting the challenged statements for impeachment, any error was harmless beyond a reasonable doubt.  (Chapman v. California (1976) 386 U.S. 18, 24.)  Defendant contends the erroneous admission of his statements was prejudicial because the statements (1) revealed he had "vouched for Ray's fairness and credibility" (2) "undermined [his] adamant denial that Tse made a call" at the hospital, and contradicted his testimony regarding whether a bald officer put a gun to his head and showed his willingness "to lie and exaggerate if it could help his case."  However, evidence of defendant's guilt on the escape charges was virtually indisputable.  Tse detailed defendant's assault and escape attempt, and two officers, a patient, and two nurses corroborated Tse's version of events, including the fact that defendant initiated the altercation by charging the officer and lunging at the officer's side [where] his gun was located in an attempt to remove the gun from the holster.  At least one witness saw defendant's waist chains around Tse's neck and another saw defendant bring his waist chains over the officer's head.  At least two witnesses saw that defendant's waist chains were free during his struggle with Tse.  Evidence was presented that defendant apologized directly to Tse, asked therapist Downing to convey an apology to Tse, and admitted to Officer Gomez that he tried to take Tse's gun and escape because he was facing a lengthy sentence.  Given the plethora of independent evidence that severely contradicted defendant'[s] testimony about the VMC incident, we are convinced the verdicts regarding that incident were not attributable to the admission of defendant's statements to Rogers for impeachment.

(Slip Op. at 26-27.)  In short, the Court of Appeal found that even if the admission of petitioner's statements had been erroneous, he suffered no prejudice thereby. The Court of Appeal's analysis is objectively reasonable.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.  Admission of Evidence

Petitioner claims the trial court violated his right to due process by admitting evidence of a prior incident in which petitioner stole the car of his girlfriend.  At trial, petitioner's girlfriend, Diana Segovia ("Segovia") testified that approximately two years earlier, in 1997,

petitioner had broken into her house, appeared to be under the influence of drugs, slapped her, kicked her dog, threatened her and her dog, and then stole her car.  The trial court admitted this evidence pursuant to California Evidence Code § 1101(b), as relevant to petitioner's intent to commit the theft of Quiroz's car.[15]

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing a specific federal constitutional provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984).  The due process inquiry on federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

Here, the jury could draw permissible inferences from the evidence of petitioner's prior theft of Segovia's car.  In finding such evidence admissible on the Quiroz vehicle theft charge, the California Court of Appeal discussed admissibility under California Evidence Code § 1101(b), as follows:

> Here, evidence that defendant threatened Segovia and caused her to give him her car out of fear was relevant to prove defendant's intent when he threatened Quiroz and caused Quiroz to give him his car out of fear.  The trial court properly found that defendant's intent at the time he took Quiroz's car was in issue.  The materiality of proving defendant's intent is apparent. Defendant was charged with carjacking, robbery and vehicle theft from Quiroz. To sustain a conviction for each of these offenses, the prosecution was required to prove defendant acted with the intent to temporarily or permanently deprive Quiroz of his property.  Defendant denied an intent to steal Quiroz's car, claiming he only drove it because Quiroz walked away from the car in anger after an argument.  Saying he knew he should have walked to Quiroz's house and given him the keys or just left the car at the scene of the argument, defendant testified he did the "stupid thing" and drove off in the car but that he planned to give it back.  Defendant's intent at the time he took Quiroz's car was a central disputed issue at trial.
> If a person acts similarly in similar situations, it logically can be inferred that he probably harbors the same intent in each instance.  (People v. Denis

---

[15]Although the jury was allowed to consider the "other crimes" evidence with respect to the other charges arising from the Quiroz incident as well, namely carjacking and stealing Quiroz's gold chain, this Court, like the Court of Appeal, only considers its admission on the auto theft charge because the jury acquitted petitioner of the other two charges.

(1990) 224 Cal.App.3d 563, 568.)  The challenged evidence did more than simply portray defendant as a person predisposed to stealing cars through force or fear.  The similarities between defendant's theft of Segovia's car and his theft of Quiroz's car were strong; on both occasions, defendant used drugs and/or alcohol and then threatened his victims into giving him their cars.  The similarity between defendant's conduct in the Segovia theft and the facts of this case tended to disprove defendant's alleged "stupid" mental state and to prove his criminal intent to steal Quiroz's car.

. . .

Defendant attacked and threatened Segovia and caused her to give him her car out of fear; in the present case, he attacked and threatened Quiroz and caused Quiroz to give him his car out of fear.[16]  Although one crime occurred against defendant's girlfriend during a domestic fight in which the girlfriend believed defendant was under the influence, and the other occurred against an old friend after defendant used drugs, we are convinced the circumstances of the prior and present vehicle offenses shared "substantially similar" characteristics to warrant the inference that defendant's intent was the same on each occasion.

(Slip Op. at 28-30.)   The Court of Appeal went on explain why the probative value of the

evidence outweighed its prejudicial effect under California Evidence Code § 352, as follows:

We next address defendant's claim that the evidence should have been excluded under Evidence Code section 352 because the probative value of the prior crime "was buried in inflammatory details."  Defendant argues the fact he "threatened his girlfriend's life or kicked her dog had no tendency to prove what his intent was when he drove Quiroz's car, but it had a strong tendency to inflame the jury in a way that the charged crime itself would not."

However, Segovia, the victim of the prior car theft, was a reluctant and hostile witness who had ignored subpoenas to appear in this case.  She still loved defendant and tried to downplay the prior incident, claiming she had exaggerated defendant's conduct to police out of anger at the time.  Given her attitude, the trial court gave the prosecution leeway to establish Segovia's fear at the time defendant took her car.  The fact defendant threatened her life was relevant to establish that he intended to take her car by scaring her into giving it to him.  On the other hand, the court excluded evidence of the fact Segovia was pregnant at the time of the incident pursuant to Evidence Code section 352.  Details of the threats made to Segovia were disclosed as a result of her recalcitrance as a witness and the difficulty in establishing her fear at the time defendant took her car.

(Slip Op. at 30-31.)  The Court of Appeal's determination that the evidence was admissible

under § 1101(b), and not rendered inadmissible under § 352, is a determination of state law

binding on this Court.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988).  With respect to

whether the admission of such evidence violated petitioner's federal right to due process, it

was not "unreasonable" within the meaning of 28 U.S.C. § 2254(d)(1) for the Court of

---

[16]In addition, both owners testified that petitioner threatened harm if the police were contacted.

Appeal to find permissible inferences could be drawn from the evidence, insofar as it was relevant to show that petitioner did not, as he testified, simply make a "stupid" mistake and plan to return Quiroz's car, but instead that he intended to steal it.  As permissible inferences could be drawn from the evidence of petitioner's prior theft of Segovia's car, admission of such evidence did not render the trial fundamentally unfair so as to violate petitioner's right to due process.

Furthermore, even if admitting the evidence regarding the Segovia incident was in error, such error was harmless.  In order to obtain habeas relief, petitioner must show that the error was one of constitutional dimension and that it had "'a substantial and injurious effect' on the verdict.'"  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).  Petitioner asserts the evidence should not have been admitted because of the risk the jury would convict him based on the impression that he had a bad character.  As the California Court of Appeal correctly explained, however, the jury already would have known that petitioner was not "an honest and upright citizen," (see Slip Op. at 32), based on his own testimony about his criminal and drug abuse history, as well as his testimony that he drove off in Quiroz's car after a fight over illegal drugs.  (See Slip Op. at 31-32.)  Moreover, the fact that the jury acquitted petitioner of the other two charges involving Quiroz indicates that they did not, as petitioner fears, simply decide petitioner was guilty of the theft based on an impermissible inference that petitioner was a person of bad character.  Had bad character been the basis for the jury's verdict, petitioner would have been convicted of all three charges in which Quiroz was alleged to be the victim.  Under such circumstances, the Court finds the admission of Segovia's testimony did not have a substantial and injurious effect on the jury's verdict.

In his traverse, petitioner raises a new argument, that his right to due process was violated because the trial court did not instruct the jury that the Segovia evidence was limited to the charges stemming from the Quiroz incident.  Such argument is not persuasive.  At the outset, the Court notes that new claims may not be raised in a traverse.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).  In any event, petitioner's claim is without

merit.  As noted by the Court of Appeal, the trial court, immediately prior to Segovia's testimony, did in fact admonish the jury that the Segovia incident was only to be considered "'regarding the Quiroz alleged carjacking, auto theft[,][17] robbery'" and only "'for the purpose of determining the intent of Mr. Trevino with regard to the Quiroz incident.'"  (Slip Op. at 30 n.9 (quoting trial court); RT at 1816.)  Petitioner apparently is arguing that this limitation was not sufficient because, immediately after Segovia and Cardona testified and at the end of the trial, the trial court repeated the instructions limiting the Segovia evidence to the issue of intent without again stating the evidence only applied to petitioner's intent on the Quiroz charges.  (RT at 1880/53 - 1880/54, 2436-37.)  In evaluating whether an instruction violated petitioner's right to due process, the Court must consider the jury instructions as a whole, not a single instruction in isolation.  See Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam).  In considering the instructions as a whole, the Court finds the instructions given prior to Segovia's testimony clearly informed the jury that the evidence was limited to the Quiroz charges.  Moreover, when the trial court, apparently in an exercise of caution, admonished the jury again following that testimony, the trial court made it clear that the purpose thereof was to remind the jury of the instruction it had given in advance of the testimony.  (RT at 1180/53) ("Again, I'm going to admonish you . . . .").  Consequently, the trial was not rendered fundamentally unfair by any failure by the trial court to remind the jury of such limitation in subsequent iterations of the instructions.

Accordingly, petitioner is not entitled to habeas relief on this claim.

3.      Failure to Modify CALJIC No. 2.50

Petitioner claims the trial court's failure to modify the jury instruction regarding the use of the evidence of other crimes arising out of the Segovia incident violated his right to due process.  The trial court instructed the jury, pursuant to CALJIC No. 2.50, that it could

---

[17]Alteration in original.

only consider the evidence of petitioner's "other crimes" on the issue of petitioner's intent.[18]

Petitioner complains the instructions did not specify that the "other crimes" did not include

petitioner's five prior felony convictions that were separately admitted for purposes of

impeachment.[19]

The California Court of Appeal provided the relevant background to this claim, as

follows:

> The jury was instructed with CALJIC No. 2.50 on three occasions
> during the trial, and defense counsel also read the instruction to the jury during
> final argument in [connection] with his discussion of the Segovia incident.  The
> first instruction, which immediately preceded Segovia's testimony, specifically
> informed the jury that evidence of the Segovia incident was admitted into
> evidence "regarding the Quiroz alleged car jacking auto theft[,][20] robbery."  It
> also informed the jury that it only could consider the evidence "for the purpose
> of determining the intent of Mr. Trevino with regard to the Quiroz incident."
> After Segovia's testimony, the trial court again admonished the jury pursuant to
> CALJIC No. 2.50.  It explained to the jurors that it wanted to make it "very
> clear" that the evidence from witnesses Segovia, Cardona, and Laufer [sic][21]
> could be considered "for only the limited purpose of determining if it tends to
> show the existence of the intent" and that they were "not permitted to consider
> such evidence for other purpose[s]."[22]  The court instructed the jury with
> CALJIC No. 2.50 a third time at the end of the trial; on that occasion, it did not
> remind the jury that the instruction pertained to the Segovia evidence.

(Slip Op. at 32-33.)

"Not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the

---

[18]CALJIC No. 2.50 reads, in relevant part: "Evidence has been introduced for the purpose of showing that defendant committed crimes other than that for which he is on trial. [¶] . . . This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you only for the limited purpose of determining if it tends to show: [¶] the existence of the intent which is a necessary element of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶]  You are not permitted consider such evidence for any other purpose."

[19]These prior convictions, which did not arise out of the Segovia incident, were for being a felon in possession of a firearm, grand theft of a firearm, taking a vehicle, burglary, and robbery.  (RT at 2170-73.)

[20]Alteration in original.

[21]In its second admonition with respect to the Segovia incident, which admonition followed the testimony of Segovia and Cardona, the trial court misspoke in referring to the "next witness, Mr. Laufer." (RT at 1880/53.)  The next witness was Sgt. Millard.

[22]Alteration in original.

level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 434-35 (2004) (per

curiam).  The question is "whether the ailing instruction . . . so infected the entire trial that

the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991)

(quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  "[A] single instruction to a jury may

not be judged in artificial isolation, but must be viewed in the context of the overall charge."

Cupp, 414 U.S. at 146-47.  "If the charge as a whole is ambiguous, the question is whether

there is a reasonable likelihood that the jury has applied the challenged instruction in a way

that violates the Constitution." Middleton, 541 U.S. at 437 (internal quotation and citation

omitted).

   Here, given the overall charge to the jury, there is no reasonable likelihood that the

jury believed they could consider petitioner's five prior felony convictions as part of the

other-crimes evidence relevant to petitioner's intent to steal Quiroz's car.  The California

Court of Appeal reached the same conclusion, with the following analysis:

> [H]ere, the jury was instructed, pursuant to CALJIC No. 2.23, that evidence of defendant's prior felony convictions was to be considered only for the purpose of impeachment and for determining a witness's credibility. Furthermore, before and after the jury heard the other-crimes evidence, it was instructed with CALJIC No. 2.50 and, on those two occasions, the trial court properly explained that the instruction referred to the other-crimes evidence introduced about the Segovia incident.  Accordingly, we conclude there is no reasonable possibility the jury considered defendant's prior felony convictions in making its determination on the issue of defendant's intent in taking Quiroz's car.
>
> In reaching this conclusion, we have rejected defendant's suggestion that the jury "would not have assumed that CALJIC No. 2.23 somehow stated an exception to CALJIC No. 2.50"and could have believed CALJIC No. 2.23 pertained to the prior felonies of other witnesses while CALJIC No. 2.50 addressed treatment of his own prior felony convictions.  CALJIC No. 2.23 explained that "the fact that a witness has been convicted of a felony, if this is a fact, may be considered by you *only for the purpose of determining the believability of that witness.*"  (Italics added.)  By contrast, CALJIC No. 2.50 explained that the other-crimes evidence, if believed, "may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged," and CALJIC No. 2.09 admonished jurors that evidence which is admitted for a limited purpose can only be considered for the limited purpose for which it was admitted.
>
> Although the trial court in this case should have instructed the jury at the end of trial as to which evidence was referred to in the CALJIC No. 2.50 instruction since prior convictions were admitted for impeachment and other-crimes evidence also had been admitted, we find the error harmless.

1  (Slip Op. at 33-34.)

2  　　　The Court of Appeal's analysis was reasonable in light of the overall charge to the

3  jury.  Pursuant to CALJIC No. 2.23, the jury was told that it could "only" consider the prior

4  convictions on the issue of petitioner's believability.  In addition, although the third iteration

5  of CALJIC No. 2.50 did not specify the crimes that could be considered on the issue of

6  petitioner's intent, on two previous occasions, both immediately prior to and immediately

7  after Segovia and Cardona testified regarding the Segovia incident, the instructions clearly

8  indicated that the "other crimes" evidence was the evidence of the Segovia incident.

9  Viewing the instructions as a whole, the Court of Appeal's conclusion, that no reasonable

10  likelihood existed that the jury would misapply the instructions, was neither contrary to nor

11  an unreasonable application of federal law within the meaning of § 2254(d)(1).

12  　　　Accordingly, petitioner is not entitled to habeas relief on this claim.

13  　　　　4.　Prosecutorial Misconduct

14  　　　Petitioner claims the prosecutor committed misconduct on several occasions during

15  his closing argument, in violation of petitioner's right to due process.  A claim of

16  prosecutorial misconduct may be the basis for federal habeas relief only if the conduct so

17  infected the trial as to render it fundamentally unfair, in violation of the right to due process.

18  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Also add Brecht cite from prose

19  misconduct blurb.

20  　　　　　a.　Misrepresentation of Potential Punishment

21  　　　Petitioner claims the prosecutor misrepresented his potential punishment during

22  closing argument.  The California Court of Appeal described the prosecutor's comments and

23  analyzed this claim as follows:

24  　　　　　When defense counsel argued the prosecution was "trying to lock
[defendant] up for the rest of his life," the trial court sustained an objection.

25  Without objection, defense counsel told the jury he has a "very scary job"
where there is "a lot at stake," that there is so much "on the line" here.  In his

26  closing remarks to the jury, counsel said, "God help you in your decision."
　　　　　The prosecution then argued, "You read the jury instructions and it's

27  asking you to be dispassionate.  Let the judge do the sentencing.  [Defense
counsel] didn't tell you judges have great discretion even in people who are

28  looking at 25 to life, 85 to life.  People, you saw Mr. Trevino get a drug

program last time.  [¶] Legislature gives the judges great discretion and why would a –" When defense counsel objected, the trial court sustained the objection as to the comment about the legislature giving discretion.  The prosecutor continued, "Why would a jury be somehow capable with the little that they know about Mr. Trevino to make determinations regarding sentencing?  That would be like somebody in your job coming in with almost no preparation and hearing some facts and all of a sudden making decisions at your job.  [¶] This judge will make the right decision on the verdicts you come back on.  You can trust in that and she will make it based on all the evidence and all the facts that defendant – on each side of the fence.  She'll probably hear from a probation officer, parole officer, family, everything else.  She's going to hear about everything he's ever been to –"  When defense counsel again objected, the trial court sustained the objection and told the jury, "*You should set penalty and punishment aside.*"  The prosecutor then asked the jurors "to go in there and deliberate.  Deliberate on the elements of the counts.  Try to be dispassionate, have no pity, no prejudice of any sort . . ."

Immediately after the prosecutor's improper remarks on penalty, the trial court sustained the defense objection and admonished the jury to set penalty and punishment aside. After the admonition, the prosecutor properly told the jury to simply deliberate the elements of each charge without considerations of pity or prejudice.  The jury also was separately instructed not to discuss or consider the subject of penalty or punishment and not to let the subject of punishment in any way affect its verdict.  We are convinced the prosecutor's comments did not diminish the jury's role and responsibilities in this case, since any improper inferences regarding potential punishment were dispelled by admonition and instruction and it is apparent the jury weighed the evidence of each count separately and found defendant guilty of some counts but not of others.  (*People v. Kegler* (1987) 197 Cal.App.3d 72, 91.)

(Slip Op. at 34-35) (emphasis and alterations in original).

The Court of Appeal's rejection of this claim was reasonable.  The trial court sustained objections to the majority of the prosecutor's comments, and, immediately following the second objection, the trial court specifically admonished the jury to set aside considerations of petitioner's penalty and punishment.  In addition, the jury was instructed on two occasions, both immediately after the prosecutor's comments and also at the close of evidence, not to discuss or consider the subject of penalty or punishment or to let that subject affect its verdict.  Jurors are presumed to follow the instructions given to them by the court, see Greer v. Miller, 483 U.S. 756, 766 n.8 (1987), and petitioner offers no basis for overcoming that presumption here.  As the objections to the majority of the comments were sustained, and in light of the presumption that the jury followed the trial court's instructions not to consider the penalty or punishment petitioner might face, the prosecutor's comments did not "so infect the trial" as to render it fundamentally unfair and violate petitioner's right

1    to due process.[23]  Consequently, the state court's rejection of this claim was neither contrary

2    to nor an unreasonable application of federal law.

3                          b.    Facts Outside Record / Subornation of Perjury

4          Petitioner claims the prosecutor, during closing argument, argued facts not in

5    evidence, and suggested that defense counsel had attempted to suborn perjury.  The

6    California Court of Appeal set forth the following background and analysis with respect to

7    this claim:

8              Defense counsel objected when, in recounting discrepancies between
         defense counsel's opening statement and the evidence, the prosecutor said
9        defense counsel had told the jury that his client's first attorney, Adrian Dell,
         would testify she "never told [defendant] he was facing a maximum of 85 years
10       to life in this case" but "she will not come in and perjure herself.  She will not
         tell you that attorneys tell their clients what they're facing and she was not – "
11       In response to the objection, the court told the jury that "[c]ounsel can
         comment on the fact that there was in opening statement an offer of proof made
12       and that the party did not present that evidence.  But *the reasons for not
         presenting the evidence could be a multitude. [¶] This is argument.  Again,
13       what the attorneys say is not evidence.*"  (Emphasis added.)  The prosecutor
         then continued, "She would not come in and I say that and she would not.  I
14       can't call Ms. Dell, if anybody is wondering; there is an attorney-client
         privilege which would have to be waived . . . ."  A defense objection to these
15       latter remarks was overruled.[24]
              Defendant's claim to the contrary, we conclude the court's immediate
16       admonition to the jury that the prosecutor's suggestion regarding what the
         witness might have said does not constitute evidence combined with the court's
17       explanation that there could be a multitude of reasons for defense counsel not
         presenting the evidence in question cured any harm which might have resulted
18       from the prosecutor's brief improper remarks.  Accordingly, since the jury is
         presumed to have followed the court's instructions (*Delli Paoli v. United States*
19       (1957) 352 U.S. 232, 242; *People v. Bonin* (1988) 46 Cal.3d 659, 699) "'there
         is no possibility that the jury would have reached a more favorable verdict had
20       the perceived misconduct not occurred.' [Citation.]" (*People v. Gionis* (1995) 9
         Cal.4th 1196, 1220.)
21
22   (Slip Op. at 36-37) (emphasis, alterations and footnote in original).

23

         ───────────────

24          [23]For the same reasons, namely, that the trial court sustained the majority of the
     prosecutor's objections and the jury presumptively followed the trial court's instructions not
25   to consider penalty and punishment, this Court finds any resulting error to be harmless under
     the Brecht standard.
26
27          [24]Contrary to defendant's claim, the trial court did not abuse its discretion by denying
     the defense motion for a new trial based upon this comment by the prosecutor.  (*People v.
     Delgado* (1993) 5 Cal.4th 312, 328.)  The trial court noted that the prosecutor's comment did
28   not implicate defense counsel in a charge of perjury and that the jury was admonished that
     statements of counsel are not evidence.

1    Again, the Court of Appeal's analysis was reasonable.  Although it appears the

2    prosecutor improperly speculated that testimony by Adrian Dell ("Dell") would have been

3    unfavorable to petitioner, such comments did not render the trial so unfair as to violate due

4    process in the context of this case.  The trial court instructed the jury in the midst of the

5    prosecutor's comments, as well as in the jury instructions at the close of evidence, that the

6    prosecutor's comments are not evidence.  The Court of Appeal correctly noted that the jury is

7    presumed, based on such instructions, not to have considered the prosecutor's speculation as

8    to Dell's testimony to be evidence.  See Greer, 483 U.S. at 766 n.8.  Consequently, the

9    prosecutor's comments did not "so infect the trial" as to violate petitioner's due process right

10   to a fair trial,[25] and the state court's rejection of this claim was neither contrary to nor an

11   unreasonable application of federal law.

12                    c.    Remaining Prosecutorial Misconduct Claims

13   Additionally, petitioner complains about two portions of the prosecutor's rebuttal

14   argument.  First, petitioner cites a portion of the rebuttal in which he claims the prosecutor

15   expressed his own and the judge's belief in petitioner's guilt.  Second, petitioner cites a

16   portion of the rebuttal in which he claims the prosecutor argued facts not in evidence,

17   suggested the defense had fabricated evidence, and further suggested the defense suborned

18   perjury.  The California Court of Appeal found such claims were waived because petitioner

19   failed to object to these comments by the prosecutor at trial.  (Slip Op. at 42.)

20   Respondent argues that petitioner procedurally defaulted this claim because he failed

21   to follow California's procedural rules mandating contemporaneous objections at trial.  A

22   federal court will not review questions of federal law decided by a state court if the decision

23   also rests on a state law ground that is independent of the federal question and adequate to

24   support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  In cases in

25   which a state prisoner has defaulted his federal claims in state court pursuant to an

26

27   _____

28       [25]For the same reasons, namely, that the jury presumptively followed the trial court's
     instructions that the prosecutor's comments were not evidence, the Court finds any error to
     be harmless under the Brecht standard.

independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate the failure to consider the claims will result in a fundamental miscarriage of justice.  See id. at 750.  The rule cited here by the Court of Appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules). Consequently, petitioner's remaining claims of prosecutorial misconduct are procedurally defaulted.

Petitioner argues there is cause to excuse his procedural default because his attorney's failure to make contemporaneous objections to the prosecutor's comments constituted ineffective assistance of counsel.[26]  A petitioner may show "cause" to excuse procedural default by establishing constitutionally ineffective assistance of counsel; attorney error short of constitutionally ineffective assistance, however, does not constitute cause and will not excuse a procedural default.  See McCleskey v. Zant, 499 U.S. 467, 494 (1991).  To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the petitioner was prejudiced by counsel's deficient performance, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Loveland v. Hatcher, 231 F.3d 640, 644  (9th Cir. 2000).[27]  In addition, the petitioner must establish that the state court "applied Strickland to the facts of

---

[26]Petitioner makes no argument that procedural default is excused based on a miscarriage of justice, nor is any such argument apparent from the record.

[27]To serve as "cause," the claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts, see Murray v. Carrier, 477 U.S. 478, 489 (1986); petitioner did so in this case, see Slip Op. at 37-44.

1    his case in an objectively unreasonable manner." <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002).

2        Here, petitioner's claim of ineffective assistance of counsel does not serve as "cause"

3    because petitioner cannot demonstrate he was prejudiced as a result of counsel's failure to

4    object to the prosecutor's comments.  Petitioner's first contention is that his counsel should

5    have objected to the prosecutor's comments about the prosecution's dismissal of Count 7, on

6    the ground such comments expressed the prosecutor's and the judge's belief that petitioner

7    was guilty of the remaining charges.  In that regard, defense counsel had stated in closing

8    argument that dismissal of Count 7, in which petitioner had been charged with attempting to

9    take Officer Tse's gun, indicated the prosecution's case as a whole was weak.  The

10   prosecutor's response on rebuttal was as follows:

> I'd like to think when I do the ethical thing and drop an allegation of a charge, that the defense usually is pretty happy about it; but I guess they're going to turn this one into the fact that it should have never been charged or whatever.
> It went through, both counsel went through probable cause hearings where judges had to rule on the sufficiency of the evidence and the evidence was there and there was a matter of how it was going to come out at trial.  My duty is always going to be to charge things that I believe are proven and if they're not, I stand up and dismiss them.

16   (RT at 2601-02.)  The Court of Appeal found the jury's acquittal of petitioner on two charges

17   indicated the jury had not been affected by any suggestion in the prosecutor's comments that

18   he or the judge personally believed petitioner was guilty.  (Slip Op. at 42-43.)  If the jury had

19   based its verdict on the supposition that the prosecutor and the judge believed petitioner was

20   guilty, it would have convicted petitioner of all the charges.  The fact that the jury convicted

21   petitioner on some counts and acquitted him on others indicates their verdict was based on an

22   independent weighing of the evidence and independent determination as to each count.

23   Consequently, the Court of Appeal's conclusion that petitioner was not prejudiced by

24   counsel's failure to object to the prosecutor's comments was objectively reasonable.

25       Next, petitioner contends counsel should have objected to the prosecutor's comments

26   about defense counsel's suggestion that Victor "Manuel" Nanez ("Nanez") was responsible

27   for the theft of Topete's van.  Petitioner argues such comments referred to facts not in

28   evidence, implied that defense counsel had fabricated evidence and suborned perjury, and

expressed the prosecutor's personal feelings about the case.  In this instance, defense counsel

had argued to the jury that Nanez might have stolen Topete's van, and that there was

reasonable doubt because the police had not tried to lift fingerprints from the backpack and

clothing in the van.  Petitioner points to the following portion of the prosecutor's rebuttal to

defense counsel's argument:

> [The officers] did exactly what they should have, they took the statements of the witnesses who said there was no one else there, he was -- that Mr. Trevino was talking about "My keys, my van."  There was never even an [inkling] in anyone's mind that anyone else was there, let alone that came into the house.
>
> They took photos of the house and of the brick and stuff, they took fingerprints from the car . . . to identify the driver who just ran away from the scene.  Had they captured Mr. Trevino, they wouldn't have taken fingerprints most likely but they were trying to identify who just ran from the scene with the stolen car.
>
> They recovered some usable prints luckily.  Doesn't always happen of course and they took the backpack and its contents into evidence. . . . I can't think of anything else they could have done based on what they knew.
>
> The backpack and its contents could be fingerprinted later if necessary.  There was no [inkling] that anyone else was involved.  In fact, ladies and gentlemen that's my point.  There was never an [inkling] in this case that anyone else was a suspect, a witness, or anything from June 24, 1999 through May 23rd of the opening statement of defense counsel.
>
> That's when Victor Nanez's name first came up.  The defense investigator Fred Porras, that's why I put him on the stand at the end.  You heard that he never interviewed Rebecca Fletes regarding this, he never interviewed Tanya Harris, no interviews of anybody at the Cliffwood House that night.  He interviewed everyone at VMC, tried to anyway.  He was crawling all over there, taking photos, going to see Philip Quiroz on multiple occasions.
>
> Ladies and gentlemen, this was a count that as far as anyone could tell was conceded, it was not even going to be disputed.  Mr. Porras never called me to – excuse me.  He never went with me to view the evidence in the case or anything like that.  There was never any requests [sic] for prints to be taken from a backpack or any of the items that were sitting there in evidence during this entire time before the attorneys started handling them in court and stuff like that.  He could have requested it if we didn't do it, he certainly could have got a court order to do it.  What is this telling you?  Well, let me go on.
>
> He never asked to compare the prints off the van to Manual [sic] Nanez or anyone else.  Can you imagine if somebody else is involved in this trial, you're sitting there with prints.  Where is the request to compare?
>
> Manual [sic] Nanez's name never came up as a witness, a suspect or anything else and that's what the frustration that I have in telling you this.  And you heard no evidence that he was ever mentioned before.  So what happened?

(RT at 2604-06.)  The prosecutor then explained how, during his trial preparation, he

discovered Officer Imobergsted's report describing Nanez's participation in the 7-Eleven

show-up for Quiroz, and faxed the report to defense counsel.  The prosecutor went on to

1   state:

2           Well, low and behold I was as shocked as anyone else that the next day
        in opening statement, that was the prosecutor they were accusing of the crime.
3       Victor Nanez.  Not the crime that he had – the Phillip Quiroz thing but the
        crime of the Cliffwood offense.  It's just like wait a second, this isn't going to
4       hold up.
                You sit there and you listen to this and it was going to be based on the
5       fact that Tanya Harris who gave an incredible description, I'm sure you'll
        agree, of Victor Trevino that night . . .
6               Tanya Harris was able to talk about naked ladies on arms, she was able
        to talk about "San Jo" across the stomach and she was able to talk about his
7       height, weight, most everything perfectly and other aspects of him; his age she
        even hit right on the head.  Late 20's she said.
8       . . .
                But when you take into consideration that there was no incline [sic] of
9       this gentleman beforehand or any time before the trial, it should make you a
        little bit suspicious of where Mr. Victor Nanez came from.
10              So when we heard it, obviously as Mr. Nanez testified, we ran out
        subpoenaed him that night and had some process server serve him, threw him
11      on the stand blind, not on anybody's witness list and testified for you and of
        course denied knowing anything about the van and said he was never at the
12      house, just like Mrs. Fletes and Mrs. Harris did.

13  (RT at 2606-08.)

14      The Court of Appeal found counsel's failure to object to the foregoing remarks

15  harmless, based on the following reasoning:

16          We first note that there was some evidentiary basis for the prosecutor's
        comments about [Imobergsted's] police report and the defense's pretrial
17      investigation. [Imobergsted] testified about his contact with Nanez on the
        morning of June 24, he testified the prosecution did not discover his report until
18      the night before the trial began, and the parties stipulated Imobergsted's  report
        regarding Nanez was turned over to the defense on May 22, 2000, the day the
19      prosecution found it in the file.  Defense investigator Porras interviewed Nanez
        the following day.  Nanez testified in the People's case on May 24, 2000.  The
20      defense made no pretrial discovery requests pertaining to the theft of Topete's
        van.  Porras testified he had contact with the prosecution at various times
21      during pretrial phase of the case; he only requested photographs pertaining to
        the VMC incident.  He never interviewed Fletes or Harris, and he did not begin
22      a search for Nanez until the afternoon of May 23, 2000.  While many of the
        prosecutor's comments were based upon the evidence and he was entitled to
23      imply the defense was fabricated where such inferences are supported by the
        evidence (*People v. Milner* (1988) 45 Cal.3d 227, 245), we agree with
24      defendant that some of his comments included matters not brought out in
        testimony and contained expressions of the prosecutor's personal feelings
25      about the case.  However, while none of the trial witnesses corroborated
        defendant's claim that Nanez was present at Fletes' barbecue, that he had been
26      in Topete's van, or that he was responsible for its theft, the evidence
        established that defendant was seen driving the stolen van not long after the
27      theft, he told people at the barbecue the van belonged to him and referred to its
        keys as his, his fingerprints were found on the exterior door frame on the
28      driver's side of the van, and he fled when a police officer pulled behind the

31

van. In light of the evidence presented at trial, we are convinced it is not reasonably probable the jury would have reached a different verdict regarding the theft of Topete's van in the absence of the prosecutor's improper remarks. (*People v. Price*, 1 Cal.4th [324,] 440 [(1991)].)

(Slip Op. at 43-44.)

The Court of Appeal reasonably found counsel's failure to object to the prosecutor's comments about the theft of Topete's van to be harmless. As the Court of Appeal noted, there was evidentiary support for the prosecutor's comments regarding the defense's lack of preparation on the charges insofar as the defense had not requested discovery regarding the theft of the van, and the defense investigator testified he did not interview Fletes or Harris, the principal prosecution witnesses to the incident. More significantly, the only evidence that Nanez stole the van was petitioner's own self-serving testimony, whereas eyewitnesses testified petitioner was driving the van not long after the theft and that he claimed the van and its keys were his, his fingerprints were found on the driver's side, and he fled when the police arrived. To the extent any of the prosecutor's comments were improper, there is no likelihood such remarks made any difference in the verdict; as set forth in detail above, the evidence that petitioner stole the van was overwhelming. Under such circumstances, the state court was not unreasonable in finding there was no cognizable probability that counsel's failure to object to the prosecutor's comments made a difference in the outcome of the trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

5.     CALJIC No. 17.41.1

Petitioner claims the use of CALJIC No. 17.41.1, which instructs jurors to inform the court of other jurors' misconduct, violated his right to a unanimous jury. The Ninth Circuit, however, has expressly held the use of CALJIC No. 17.41.1 is neither contrary to nor an unreasonable application of Supreme Court precedent. See Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims based on use of CALJIC No. 17.41.1).

Accordingly, petitioner is not entitled to habeas relief on this claim.

**CONCLUSION**

For the reasons discussed, the petition for a writ of habeas corpus is hereby DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: March 13, 2007

MAXINE M. CHESNEY
United States District Judge

33